**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| INTERNATIONAL REAL ESTATE HOLDING COMPANY, LLC, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:11-cv-02317-M |
| FOR 1013 REGENTS, LLC, AND RAINIER ASSET MANAGEMENT COMPANY, LLC, ET AL., | § § § § | |
| Defendant. | § § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is the Motion for Summary Judgment as to Defendant Rainier Asset Management Company, LLC ("Rainier" or the "Manager") [Docket Entry #37], filed by Plaintiff International Real Estate Holding Company, LLC ("Plaintiff," "International Real Estate," or "lender").  This Motion implicates two principal issues: (1) whether International Real Estate is an intended third-party beneficiary of an agreement between Rainier and another party, and (2) if so, whether Rainier breached its contractual obligations.  For the reasons discussed below, the Court concludes that there is a genuine issue of material fact as to Rainier's breach, and therefore **DENIES** the Motion.

## I.    BACKGROUND

In 2008, M & I Bank provided financing in the amount of $3,397,528.00 (the "Loan") to twenty-six co-borrowers to purchase real property in Beaumont, Texas (the "Property"). *McManamon's Aff.* ¶ 4 (*Pl.'s App.* 6).[1]  The co-borrowers and their successors became tenants in

---

[1] Defendant objects to the admissibility of the affidavit of Lawrence McManamon on two

common (the "TICs") in the Property.  *Pl.'s Mot.* ¶ 2.  As a condition to the Loan, the TICs

entered into a loan agreement (the "Loan Agreement") with M & I Bank wherein they agreed to

"promptly and fully pay by their due date all Taxes and Other Charges now or hereafter assessed

or charged against the Property as they become due and payable."  *Id.* at ¶ 3.  M & I Bank

transferred its interest in the Loan Agreement to Brotherhood Bank and Trust, which then

transferred its interest to International Real Estate.[2]  *McManamon Aff.* ¶ 9–10.

In February 2009, the TICs and Rainier entered into an Asset and Property Management

Agreement (the "Rainier Agreement"), by which Rainier took over as the manager of the

Property.  *Id.* at ¶ 7.  The Rainier Agreement required Rainier to "use reasonable efforts to

comply, and cause the Property to be in compliance, with Loan Documents" and to "pay . . .

---

grounds.  First, Defendant points out that the title of the affidavit does not match the name of the
affiant.  Second, Defendant argues that the affidavit does not comply with the provisions of
Texas Government Code § 312.011, because it fails to state the date on which the affidavit was
signed.  Neither ground is availing.  Despite the fact that the name appearing in the title of the
affidavit is not correct, the identity of the true affiant is clear, especially considering the
signature on the affidavit.  Moreover, failure to include the date is not grounds for excluding it.
*Cooper v. Scott Irr. Const., Inc.*, 838 S.W.2d 743, 745 (Tex.  App.—El Paso 1992, no writ)
(citations omitted) ("The lack of a specific date in the jurat of an affidavit does not render the
affidavit invalid.").  Accordingly, the objections are overruled.

[2] Evidence of these assignments is found in the McManamon affidavit. *McManamon Aff.* ¶ 9–10
(stating that: (1) "M & I Bank transferred, assigned and conveyed its interest in the Loan
Documents to Brotherhood Bank;" (2) the original lender also assigned its interests in all Loan
Documents to Brotherhood Bank; (3) Brotherhood Bank assigned its interest in the Loan
Documents to International Real Estate; and (4) Brotherhood Bank executed and delivered to
International Real Estate a Bill of Sale for the Loan, an Allonge to the Note, and an Assignment
of Deed of Trust).  Rainier notes that "none of the subject debt instruments" have been attached
to the Motion, and thus argues that Plaintiff cannot prove its interest in the Loan Agreement.
Rainier, however, does not itself produce any evidence contradicting the affidavit testimony, nor
does it cite any authority supporting the proposition that when the contractual obligations
underlying a motion for summary judgment have been assigned, the movant must attach the
assignment documents.  Moreover, Plaintiff points out that Rainier's own asset manager, Cannon
Jones, admitted in his deposition that the rights in the Property had been assigned from M & I to
Brotherhood Bank and from Brotherhood Bank to International Real Estate.  *Pl.'s Reply* 5.
Accordingly, the Court concludes, based on the summary judgment record, that there is no
genuine issue of material fact as to Plaintiff's interest in the Loan Agreement.

from funds provided by the Tenants in Common or from the Operating Account, all utilities, Taxes and payments due under each Lease or Loan Document." *Rainier Agreement* 3, 6 (*Pl.'s App.* 74, 77).

On February 7, 2011, International Real Estate requested that Rainier pay real estate taxes on the Property. *McManamon Aff.* ¶ 23. Rainier acknowledged that funds to pay the taxes were available, but refused to pay them until the TICs decided whether to extend the maturity of the Loan. *Id.* at ¶ 24. The TICs' last payment on the Loan was made in March 2011. *Id.* at ¶ 25. The Loan went into default as a result of the TICs' failure to pay the debt when due, to pay taxes on the Property, and to fully lease an office building on the Property. As a result, Plaintiff allegedly had to pay $98,132.72 in property taxes and penalties, presumably to clear the Property of encumbrances before a foreclosure sale on July 5, 2011. *Id.* at ¶¶ 50, 54.

International Real Estate filed suit on September 8, 2011, asserting, among other things, breach of contract by Rainier. Specifically, International Real Estate argues that Rainier's failure to pay Property taxes was a breach of the Rainier Agreement, to which International Real Estate claims to be a third-party beneficiary.

## II.    LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a reasonable jury could return a verdict for the non-moving party, then there is a genuine dispute of material fact. *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 417 (5th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party bears the initial burden of identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986); *Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998).  Once the

movant carries its initial burden, the burden shifts to the nonmovant to show that summary

judgment is inappropriate, by designating specific facts beyond the pleadings that prove the

existence of a genuine dispute of material fact.  *See* Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at

250; *Fields v. City of S. Houston, Tex.*, 922 F.2d 1183, 1187 (5th Cir. 1991).  In determining

whether a genuine dispute of material fact exists, "factual controversies are construed in the light

most favorable to the nonmovant, but only if both parties have introduced evidence showing that

a controversy exists."  *Lynch Props.*, 140 F.3d at 625 (citation omitted).

## III.   DISCUSSION

### A.  Third-Party Beneficiary Status

As a threshold issue, the Court must determine whether, under Texas law, International

Real Estate is a third-party beneficiary of the Rainier Agreement.  International Real Estate

argues that the intent to benefit it is evidenced by the terms and formation of the Rainier

Agreement.  *Pl.'s Mot.* 12.  Rainier, in contrast, argues that the Rainier Agreement does not

express a clear intent to benefit International Real Estate.  *Def.'s Resp.* 5–7.  Alternatively,

Rainier argues that a fact question for the jury exists as to the parties' intent.  *Id.* at 5.

The Texas Supreme Court has recognized a presumption against finding that a contract

confers rights to a third party.  *Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011).  A third party

may enforce a contract only when "the parties to the contract entered the agreement with the

clear and express intention of directly benefiting the third party." *Tawes*, 340 S.W.3d at 425.

"'The fact that a person is directly affected by the parties' conduct, or that he 'may have a

substantial interest in a contract's enforcement, does not make him a third-party beneficiary.'"

*Fleetwood Enters. Inc. v. Gaskamp*, 280 F.3d 1069, 1075 (5th Cir. 2002) (applying Texas law

and quoting *Loyd v. ECO Res., Inc.*, 956 S.W.2d 110, 134 (Tex. App.—Houston [14th Dist.] 1997, no pet.)).  In other words, a third party cannot enforce a contract when the benefit conferred on it is merely indirect and incidental.  *Tawes*, 340 S.W.3d at 425.  To determine the intent of the contracting parties, courts must construe the contract as a matter of law, "examine the *entire* agreement[,] and give effect to each provision so that none is rendered meaningless," resolving all doubts against conferring third-party beneficiary status.  *Id.*

Here, Plaintiff's argument that Rainier and the TICs intended to confer a benefit upon Plaintiff rests on three grounds: that (1) the TICs owed Plaintiff a duty under the Loan Agreement, (2) the language and context of the Rainier Agreement demonstrate that Rainier assumed the TICs' duties under the Loan Agreement, and (3) the TICs requested that the lender, Plaintiff's predecessor, review and confirm the Rainier Agreement.  *Pl.'s Mot.* 12.

1. Loan Agreement Obligations

The first point is undisputed; the TICs clearly owed a duty under the Loan Agreement to pay the taxes on the Property.  Section 5.02(a) of the Loan Agreement provides:

> (a)   Payment Obligation. Borrower shall promptly and fully pay by their due date all Taxes and Other Charges now or hereafter assessed or charged against the Property as they become due and payable. . . . Borrower shall furnish to Lender, upon request, evidence satisfactory to Lender that all Taxes and Other Charges have been paid and are not delinquent.

*Loan Agreement* at 20.  Even though the Loan Agreement did not require the TICs to pay the amount of the taxes on the Property directly to the lender, the benefits of this obligation clearly inure, at least in part, to the lender.  Indeed, the failure to pay taxes on the Property would have resulted in a lien that competed with Plaintiff's interest.  But the provisions of the Loan Agreement do not, without more, indicate that the Rainier Agreement vests Plaintiff with third-party beneficiary status.

2. Rainier Agreement Provisions

The Rainier Agreement explicitly acknowledges the Loan Agreement, and the parties and

beneficiaries to it.  The Recitals provide:

> B.      The Property is encumbered by a loan from M & I Bank (including its
> successors and assigns, the "Lender"), in the aggregate original principal amount
> of $3,397,528 (the "Loan").
>
> C.      The Loan is evidenced by that certain promissory note in the original
> principal amount of $3,397,528 payable to the Lender (the "Note"), a Deed of
> Trust (the "Mortgage") and other documents evidencing or securing the Loan
> (such Note, Mortgage and other documents evidencing or securing the Loan
> hereinafter referred to collectively as the "Loan Documents").

*Rainier Agreement* 1.  Thus, the Rainier Agreement specifically recognizes International Real

Estate's predecessor-in-interest, M & I Bank, as the maker of the Loan and describes the Loan

Documents, which in turn require the TICs to pay taxes on the Property.  The parties dispute the

implications of the other language of the Rainier Agreement.

Plaintiff relies principally on Sections 2.4(a) and 2.11 of the Rainier Agreement, which

outline Rainier's responsibilities, as manager, with respect to paying Property taxes, under the

Loan Documents.  Those sections provide:

> 2.4      <u>Compliance with Laws, Mortgages and Other Matters</u>.
>
> (a)      The Manager shall use reasonable efforts to comply, and cause the
> Property to be in compliance, with Loan Documents and all applicable
> governmental requirements. . . .The Manager shall pay from the Operating
> Account (as defined in Section 6.2) expenses incurred to remedy violations of
> laws.  However, the Manager shall not be obligated to remedy violations of law if
> sufficient funds are not available in the Operating Account or if the Tenants in
> Common do not provide sufficient additional funds to do so.
>
> . . . .
>
> 2.11     <u>Taxes and Mortgages</u>. . . . . The Manager shall pay, within the time
> required to obtain discounts, from funds provided by the Tenants in Common or
> from the Operating Account, all utilities, Taxes and payments due under each
> Lease or Loan Document, if any, affecting the Property.    To the extent

contemplated by the Budget and/or the Operating Plan (as either may be revised from time to time), the Manager may make any such payments without the approval of the Tenants in Common.

*Rainier Agreement* 3, 6.  Section 2.4(a) of the Rainier Agreement establishes a clear contractual requirement for Rainier to use reasonable efforts to keep the Property in compliance with the Loan Agreement, including paying taxes on the Property.  This section creates only one exception to the requirement—if the TICs do not provide the manager, Rainier, with sufficient funds—which no party asserts occurred here.  Section 2.11 reinforces this obligation, providing that Rainier "shall pay . . . Taxes and payments due under each Lease or Loan Document."

   3. Lender Review of Rainier Agreement

Plaintiff argues that the intent to make the lender a third-party beneficiary of the Rainier Agreement is further evidenced by the TICs' request that the original lender, M & I Bank, "review and confirm" the Rainier Agreement before it took effect.  *Pl.'s Mot.* ¶ 36.  Moreover, DBSI, the manager that preceded Rainier, withheld rent checks from Rainier until it received written consent to the Rainier Agreement from the lender.  *Pl.'s App.* 146.  Plaintiff argues "the only logical reason for this request was for Lender to ensure that its interests would be protected under the Rainier Agreement."  *Pl.'s Mot.* ¶ 36.  But this is simply conjecture, and neither party has introduced evidence of the purpose of either request.  The Court agrees that Plaintiff's interpretation is a plausible one, but cannot conclude that it is the *only* reasonable interpretation. In the context of a summary judgment motion, this ambiguity must be resolved against the movant.

   4. Analysis

Despite the indefinite implications of the requests for the lender to review the Rainier Agreement, the Court concludes that the terms and context of the Rainier Agreement evince a

clear intent to benefit the lender and its successors.  Indeed, a Texas appellate court found that a similar set of circumstances vested a third party with the right to enforce a contract.  *Vapor Corp. v. Welker*, 582 S.W.2d 858, 862 (Tex. Civ. App.—Beaumont 1979, no writ).  In *Vapor Corp.*, Welker, an inventor, assigned a "flow regulator" patent to Vapor's predecessor-in-interest.  The assignment was reflected in a "Franchise Agreement," under which the assignee received full rights to use and market the patented technology, and Welker was to receive royalties totaling five percent of the net sales of all flow regulators.  Vapor later entered into a "manufacturing agreement" with another company, Heeco, which authorized Heeco to manufacture and sell in Europe a regulator based on Welker's patent, in exchange for certain royalties based on those sales.  Although Welker was not a signatory to the manufacturing agreement, the agreement explicitly acknowledged Vapor's royalty payment obligations under the Franchise Agreement, and authorized Heeco to pay the five percent royalty directly to Welker.

From this, the court concluded that the parties "knew and recognized that the royalty payments were due Welker."  *Id.* at 862.  Moreover, when Vapor received the royalty payments from Heeco, it catalogued a certain portion of them in an "accounting column entitled 'Reserve for Contingent Royalty.'"  *Id.*  According to the court, the combination of these factors "clearly show[ed] the intent of Vapor and Heeco that the [manufacturing] contract was made for the benefit of Welker," and therefore, that Welker was a third-party beneficiary of the manufacturing contract.  *Id.*

As in *Vapor Corp.*, the agreement in question here—the Rainier Agreement— acknowledges an underlying contract that benefits a third party.  The manufacturing agreement acknowledged the Franchise Agreement and Welker's stake in it; the Rainier Agreement acknowledges the Loan Agreement and Plaintiff's stake in it.  Admittedly, the benefit to Welker

under the Franchise Agreement is arguably more direct than the benefit to International Real

Estate under the Loan Agreement—whereas Welker received payments directly, the taxes on the

Property were to be paid, presumably, to the government, not to Plaintiff.  But this distinction is

not dispositive.  International Real Estate may not have been the direct *recipient* of the tax

payments, but it was a direct *beneficiary* of the contractual obligation to pay taxes on the

Property.  If Plaintiff's predecessor did not view the payments as a benefit, it would not have

contracted for them.

 Furthermore, the Rainier Agreement delegated to Rainier the responsibility to take action

benefiting Plaintiff.  In *Vapor Corp.*, the manufacturing agreement authorized Heeco to pay

Welker directly, but it *did not require* Heeco to make those payments.  *Vapor Corp.*, 582 S.W.2d

at 862.  In contrast, Sections 2.4(a) and 2.11 of the Rainier Agreement oblige Rainier to either

ensure that the TICs pay all taxes due under the Loan Agreement, or to do so itself.  This

requirement demonstrates an even greater intent to benefit the third-party than did the analogous

provision of the *Vapor Corp.* contract.

 Unlike in *Vapor Corp.*, this Court does not have direct evidence of the signatories'

actions that confirms the intent expressed in the contract.  The Rainier Agreement took effect in

2009.  The unpaid property taxes accrued in 2010.  Presumably, someone paid the 2009 property

taxes, but the Court has no evidence as to whether Rainier itself paid the taxes or otherwise used

reasonable efforts to cause the TICs to pay them.  Nevertheless, the Court concludes that the

language of the contract and other attendant circumstances evince the parties' intent to benefit

Plaintiff, and overcome the presumption against the presence of third-party beneficiaries.

 The Texas Supreme Court's decision in *Stine v. Stewart* supports this result. 80 S.W.3d

586 (Tex. 2002).  There, the plaintiff, Stine, loaned $100,000 to her daughter and son-in-law, the

Stewarts, to help them purchase a house (the "home loan").  By the time the Stewarts divorced,

they had repaid half of the loan.  The divorce agreement provided that any proceeds from the sale

of the Stewarts' house would be applied to the $50,000 balance on the home loan, and that any

debt remaining after applying the sale proceeds would be divided equally between the Stewarts

and would be due immediately after the sale.  Stine, who was not a signatory to the divorce

agreement, sued to enforce it when the husband failed to forward the house sale proceeds to

Stine or to make any payments on the remaining home loan balance.  The court concluded that

Stine was a third-party beneficiary to the divorce agreement because it acknowledged the

Stewarts' obligation under the home loan to repay Stine and expressly required them to satisfy

that obligation.  Moreover, in distinguishing precedent, the Court noted that the divorce

agreement named a single, explicitly identified third-party.

      Like the divorce agreement in *Stine*, the Rainier Agreement refers to obligations under

the Loan Agreement, which included the obligation to pay taxes on the Property, and requires

Rainier to satisfy that obligation by mailing payments from designated accounts.  Furthermore,

the Rainier Agreement recognizes Plaintiff as the single direct beneficiary to the Loan

Agreement and third-party beneficiary to the Rainier Agreement.  In sum, the Loan Agreement

requires the TICs to pay the property taxes, an obligation that directly benefits International Real

Estate.  Rainier assumed that duty in the Rainier Agreement.  This assumption, coupled with the

recognition that Loan Agreement obligations were to benefit Plaintiff, establishes a clear intent

to confer a benefit to International Real Estate, and authorizes it to enforce the Rainier

Agreement as a third-party beneficiary.

      Rainier's evidence does not persuade the Court otherwise.  Rainier asserts that: (1) its

"sole and exclusive responsibility was to the" TICs, (2) the Rainier Agreement expresses no

intent to "confer a direct benefit on International Real Estate," (3) the TICs "specifically stated

that the" Rainier Agreement "was in no way intended to create a partnership or joint venture, and

(4) Rainier never reviewed the Loan Documents before entering into the Rainier Agreement.

*Jones Affidavit* 2–3 (*Def.'s App.* 3–4).  Statements one and two may be probative of Rainier's

intent, but do not supersede otherwise clear inferences from the language of the contracts.  The

third statement is hearsay, and the Court will not consider it.  *See* Fed. R. Evid. 801(defining

hearsay); Fed. R. Civ. P. 56(c)(4) (facts within affidavits must be admissible in evidence).  As to

statement four,[3] Rainier's alleged failure to review the Loan Documents does not change the fact

that the Rainier Agreement explicitly references those documents and obligates Rainier to use

reasonable efforts to keep the Property in compliance.  Where there is no ambiguity, the intent of

the parties is best evidenced by the language of the contract itself.

      Rainier's alternative argument also fails.  The question of whether an unambiguous

contract exhibits intent to create a third-party beneficiary is one of law, to be resolved by the

court.  *MCI Telecomms.Corp. v. Tex. Util. Elec. Co.*, 995 S.W.2d 647, 650 (Tex. 1990) ("When a

contract is not ambiguous, the construction of the written instrument is a question of law for the

court."); *Basic Capital Mgmt., Inc. v. Dynex Commercial, Inc.*, 348 S.W.3d 894, 901 (Tex.

2011), *reh'g denied* (Oct. 21, 2011) (court's inquiry includes examination not only of the

contract language, but also of "evidence regarding its negotiation and purpose" and overall

attendant circumstances).

      Finally, Plaintiff's status as a third-party beneficiary is not undermined by the fact that

the parties to the Rainier Agreement intended to benefit Plaintiff's predecessor, not International

---

[3] Plaintiff challenges statement four as not being based on personal knowledge.  *Pl.'s Resp.* 3–4.
The affiant, Cannon Jones, bases his opinions on his role as one of Rainier's asset managers "at
all times relevant to the litigation" and on his "direct involvement" with the TICs.  The Court
concludes he has sufficient personal knowledge to testify as to the facts asserted.

Real Estate.  A third-party beneficiary receives the same rights as the contracting parties.  *Texas*

*Farmers Ins. Co. v. Gerdes By & Through Griffin Chiropractic Clinic*, 880 S.W.2d 215, 218

(Tex. App.—Fort Worth 1994, writ denied).  In *Gerdes*, the court concluded that a third-party

beneficiary's ability to assign its rights was governed by contract; that is, if a contract prohibits

assignment, none should be allowed; if not, then the fact the rights assigned are those of a third-

party beneficiary does not affect an otherwise valid assignment.   Here, there is nothing to

suggest the invalidity of the assignments from the original lender, M & I, to the holder of the

Loan Documents when the Rainier Agreement took effect, Brotherhood Bank, and finally to

International Real Estate.  Neither the Loan Agreement nor the Rainier Agreement purports to

prohibit assignments.  In fact, the Rainier Agreement recognizes that the beneficiary of the Loan

Agreement includes the "successors and assigns" of M & I Bank.  *Rainier Agreement* 1.  Thus,

International Real Estate may enforce its rights as a third-party beneficiary to the Rainier

Agreement even though it did not hold those rights at the time that Agreement was made.

B.  Breach of Contract

    Having concluded that International Real Estate is a third-party beneficiary of the Rainier

Agreement, the Court must determine whether Rainier breached that agreement.  Under Texas

law, "'[t]he essential elements of a breach of contract claim are: (1) the existence of a valid

contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by

the defendant; and (4) damages sustained by the plaintiff as a result of the breach.'"  *Mullins v.*

*TestAmerica, Inc.*, 564 F.3d 386, 418 (5th Cir. 2009) (quoting *Aguiar v. Segal*, 167 S.W.3d 443,

450 (Tex. App.—Houston [14th Dist.] 2005, pet. denied)).  The element at issue here is breach;

that is, whether Rainier failed to perform its obligations under the Rainier Agreement.

    Pursuant to at least Sections 2.4(a) and 2.11 of the Rainier Agreement, Rainier had a clear

obligation to pay, or cause to be paid, the taxes on the Property.  *Rainier Agreement* 3, 6.  Rainier acknowledges that it did not pay those taxes, but contends the Rainier Agreement also required it to obtain TIC approval before making such payments.  Because the TICs did not give their approval, Rainier argues, its nonpayment does not constitute a breach.  *Def.'s Resp.* 2.

Section 1.2(a) governs approval requirements under the Rainier Agreement.  Pursuant to that section, Rainier must obtain the TICs' unanimous approval before it takes certain actions, none of which are relevant here.  *Rainier Agreement* 2.  "All other actions in [the Rainier] Agreement *requiring approval* of the Tenants in Common, may be taken by the Tenants in Common owning more than 51% of the undivided interests in the Property."  *Id.* (emphasis added).  The Court interprets this phrase to mean that for all other actions requiring approval, the Manager, Rainier, may take action only with approval of the TICs owning more than 51%.  Moreover, when approval is required, Section 1.2(b) requires Rainier to conduct a vote.  The contract explains that any TIC who does not submit written opposition within one week shall be deemed to have approved.

Accordingly, Rainier's argument hinges on whether the sections that oblige it to pay taxes on the Property—Sections 2.4 and 2.11— are ones that "require approval," as defined by Section 1.2(a).  Viewing the contract as a whole, the Court concludes that where approval is required, such a requirement is explicit.  Indeed, a number of the Agreement's subsections include express approval provisions.  For example, Section 2.5(a) obliges Rainier to obtain approval from "the Tenants in Common holding a majority of the undivided interests in the Property" before finalizing a budget.  Similarly, Section 2.6(b) requires Rainier to seek TIC approval "in accordance with Section 1.2" before finalizing a lease that falls outside the pre-approved leasing parameters.

Section 2.4(a), however, which requires Rainier to remedy violations of law and to take reasonable efforts to keep the Property in compliance with the Loan Agreement, is silent as to an approval requirement. *See Rainier Agreement* 3. Thus, by its own terms, it is not a section requiring approval. This conclusion is bolstered by the fact that Rainier did not conduct a vote, as it was obligated to do if approval was required. *Jones Affidavit* 3. Instead, upon receiving Plaintiff's demand letter for payment of taxes on the Property, Rainier forwarded the letter to the TICs, and per the TICs instruction, "withheld payment" and distributed the funds from the Operating Account directly to the TICs, rather than paying the taxes. The TICs did not express an intention to pay the taxes themselves, nor did Rainier take any action to compel such payment. In other words, Rainier took *no efforts* to cause the Property to be in compliance with the Loan Agreement and all applicable governmental requirements. Nor did it "pay from the operating account . . . expenses incurred to remedy violations of laws." Thus, the summary judgment evidence shows that Rainier breached its obligations under Section 2.4(a) of the Rainier Agreement.

Nevertheless, to the extent the obligations of Sections 2.4(a) and 2.11 overlap, there is some ambiguity as to the contractually-required approval process. Unlike Section 2.4(a), Section 2.11 alludes to an approval requirement. *Rainier Agreement* 6. Section 2.11 obliges Rainier to pay taxes on the Property, and authorizes it to make the payments "without the approval" of the TICs, but only to the "extent contemplated by the Budget and/or the Operating Plan." *Id.* The Rainier Agreement itself describes an Operating Account, but not a Budget or Operating Plan. Neither party has introduced evidence or argument to fill this gap in the record. Without such evidence, the Court concludes there is a genuine issue of material fact as to whether Rainier's nonpayment constitutes a breach. Moreover, should Section 2.11 oblige Rainier to obtain TIC

approval before paying taxes on the Property, it sits in tension with Section 2.4(a).  If, in fact,

compliance with Section 2.11 required TIC approval, the Court concludes there is at least a

genuine issue of material fact as to whether nonpayment without approval constitutes breach of

Section 2.4(a).[4]  Accordingly, International Real Estate has not carried its burden of proof as to

the issue of breach, and its Motion must be **DENIED**.

## IV.  CONCLUSION

The Court concludes that the parties to the Rainier Agreement intended the agreement to

inure, at least in part, to the benefit of International Real Estate, making it a third-party

beneficiary with rights to enforce the agreement.  Nevertheless, because there remains a genuine

issue of material fact as to Rainier's breach, Plaintiff's Motion for Summary Judgment as to

Rainier is **DENIED**.

The Court grants Plaintiff leave to file a second motion for summary judgment to address

three unresolved issues.  First, Plaintiff may present evidence and argument focused on the

approval requirements of the Budget and/or Operating Plan and their relationship to Rainier's

alleged breach.  Second, Plaintiff may address why it believes it is entitled to $21,378.90, given

that it has allegedly recovered $124,667.35 from certain TICs, $26,534.63 *more* than the

$98,132.72 in damages allegedly caused by the failure to pay taxes on the Property, and must

address when, and how much, Plaintiff recovered from the TICs.  Third, if Plaintiff expects to

recover attorney's fees, it must submit an additional affidavit detailing how many hours were

expended for each attorney and staff member *at specific stages of the litigation*.  If Plaintiff

---

[4] Plaintiff's remaining arguments are unavailing.  In his affidavit, Cannon Jones affirms that
Section 2.11 creates an obligation on Rainier to pay the property taxes, but does not address the
threshold approval requirement.  *Jones Depo.* 44.  Moreover, Section 6.2 of the Rainier
Agreement instructs Rainier to distribute funds in the Operating Account to the TICs after paying
all "operating expenses, debt service," and improvement costs, but this section does not address
the ambiguous approval requirement of Section 2.11, or its relationship with Section 2.4(a).

intends to file a second motion for summary judgment, it must do so by March 27, 2013.  In such

a circumstance, the Court will continue the current trial setting to allow adequate time to resolve

the motion.

**SO ORDERED.**

March 13, 2013.

**BARBARA M. G. LYNN**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF TEXAS**